UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

PATRICIA A. TERRY,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      CAUSE NO. 3:09-CV-503 JD
                                      )
MICHAEL J. ASTRUE,                    )
*Commissioner of Social Security*,    )
                                      )
            Defendant.                )

## **Opinion and Order**

On October 21, 2009, Plaintiff, Patricia A. Terry ("Terry"), filed her Complaint.  [DE 1].

On February 18, 2010, Terry filed an opening brief in support of her request for  remand of the

ALJ's decision.  [DE 14].  On June 4, 2010, Defendant, Commissioner of Social Security

("Commissioner"), filed a response brief in opposition.  [DE 21].  On June 16, 2010, this case

was reassigned to the undersigned for all purposes.  On June 18, 2010, Terry filed a reply.  [DE

23].

## **I.  Procedural History**

On February 22, 2006,[1] Terry filed an application under Title II of the Social Security

Act  for a period of disability and Disability Insurance Benefits ("DIB").  (Tr. 25, 85-87).  On the

same day, Terry also filed a Title XVI application for Supplemental Security Income ("SSI").[2]

(Tr. 25, 337-39).  In her applications, Terry claimed disability due to back problems, car accident

---

[1]Although both Terry and the ALJ credit her initial applications as being filed on this date, the Court notes
applications dated March 29, 2006.  *See* Tr. 85-87; 337-339.

[2] The regulations governing the determination of disability for Disability Insurance Benefits are found at 20 C.F.R. §
401.1501 *et. seq.*, while the Social Security Income regulations are set forth at 20 C.F.R. § 416.901 *et. seq.*  Because
the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all
respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

residuals, spasmodic spine, knee arthritis, stomach hernia, and irregular heartbeat and asserted an alleged onset date of October 9, 2005. (Tr. 25, 68, 85, 337). On June 24, 2006, Terry's initial applications were denied, (Tr. 25, 70-73); and, on September 11, 2006, her request for reconsideration was denied. (Tr. 25, 66). On October 19, 2006, Terry filed a timely request for a hearing with an Administrative Law Judge ("ALJ"). (Tr. 65).

On September 10, 2008, Terry appeared with counsel and testified at a hearing before an ALJ. (Tr. 25). An impartial vocational expert ("VE") also appeared at the hearing. (Tr. 25). On April 13, 2009, the ALJ found that Terry was not disabled under the Social Security Act, concluding that she had the residual functional capacity[3] ("RFC") to perform jobs that exist in significant numbers in the national economy. (Tr. 25-37).

Specifically, the ALJ found that Terry had not engaged in substantial gainful activity since October 9, 2005, and that she suffered from severe impairments of chronic lower back pain; osteoarthritis of the knees; a ventral hernia in the abdomen; morbid obesity, and depression. (Tr. 27). However, the ALJ determined that Terry did not have any impairment or combination of impairments that met the description of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 28). Specifically, the ALJ found that the claimant's severe physical impairments, either individually or in combination, did not meet or medically equal the criteria of any listed impairment. (Tr. 28). Instead, the ALJ found that Terry had the RFC to perform sedentary work[4] with the additional limitations that she can only

---

[3] Residual functional capacity is defined as the most a claimant can still do despite any physical and mental limitations that may affect what the claimant can do in a work setting. 20 C.F.R. §404.1545(a)(1).

[4] The relevant regulation defines sedentary work as follows,
> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which

perform simple, routine tasks and can only engage in occupations which do not require climbing and which only require occasional balancing, stooping, crouching, kneeling or crawling. (Tr. 30). Based on this RFC finding, the ALJ concluded that Terry was not capable of performing any past relevant work. (Tr. 35). Further, utilizing the Vocational Guidelines ("Grids") as a framework and relying on the VE's testimony, the ALJ concluded that a significant number of jobs existed in the national economy that Terry could still perform. (Tr. 35-36). Consequently, the ALJ determined that Terry was not disabled, thereby, denying Terry's applications for DIB and SSI. (Tr. 36). On July 13, 2009, the Appeals Council denied Terry's request for review, making the ALJ's decision the final decision of the Commissioner in regards to Terry's disability claims. (Tr. 7-9). 42 U.S.C. § 405(g); 20 C.F.R. § 404.981; *see Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). On October 21, 2009, Terry filed her Complaint pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was erroneous and not supported by substantial evidence. [DE 1].

## II. Facts

At the time of Terry's alleged onset date, October 9, 2005, Terry was forty-four years old. (Tr. 85). At the time of the ALJ's decision, Terry was forty-seven years old. (Tr. 30, 85, 342). Terry has an eleventh grade education, and her past relevant work includes work as a janitor. (Tr. 35). Terry has not performed substantial gainful activity, however, since her alleged onset date. (Tr. 27, 78-79, 85, 337). Terry is insured for the purposes of the status

---

involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

requirements of the Act through December 31, 2007.[5]  (Tr. 78–79).

## A.  Terry's Testimony

Terry alleges that she suffers from both exertional and non-exertional impairments. Specifically, Terry contends that she is disabled due to a ventral hernia, osteoarthritis of the knees, chronic low back pain, morbid obesity, and depression. (Tr. 27, 344-45). Terry testified that she last worked in 2005, performing maintenance work at Glen Haven Management. (Tr. 343). Terry asserted that she stopped working due to her ventral hernia, which was causing her to feel stomach pressure when bending or lifting. (Tr. 344). Terry additionally testified that she suffers from back pain, knee pain, and depression, all of which also limited her ability to work. (Tr. 345). Terry testified that she has not had surgery to repair her ventral hernia because of her weight and irregular heartbeat.  (Tr. 349-50). She also explained that she could not have surgery to repair her knees because of her weight. (Tr. 350). Terry asserted that, although her doctors had enrolled her in weight loss programs, she was unable to complete them due to her thyroid problem and pain during exercise.  (Tr. 351).

Terry additionally testified that she feels sharp pains in her back and a lot of pressure in her stomach. (Tr. 346). Further, Terry stated that standing and sitting aggravated her stomach and knee pain, and she was limited to ten to fifteen minutes doing those activities without discomfort.  (Tr. 346-47).  Terry also testified that her knees occasionally give out, preventing her from walking more than half a block at a time.  (Tr. 347).

Regarding her daily activities, Terry testified that she makes her bed, washes dishes,

---

[5] A discrepancy regarding insured status is noted between the ALJ's decision, finding the date last insured to be June 30, 2007, and the status report from the Social Security Administration, finding the date last insured to be December 31, 2007.  (Tr. 27, 78–79).

sweeps the floor, and cooks. (Tr. 348). Terry explained that she has to periodically lie down while performing the aforementioned tasks, in order to reduce her stomach and knee pain as well as swelling in her legs and feet. (Tr. 348, 353-54). Terry also stated that she leaves her apartment every once in a while to visit friends and visit the grocery store. (Tr. 349). Finally, Terry stated that she also engages in flowering, gardening, and camping. (Tr. 349).

On June 2, 2006, Terry's daughter provided a report regarding Terry's daily activities. (Tr. 135-46). In the report, Terry's daughter indicated that Terry could perform housework and personal care but could not stand or bend for prolonged periods of time. (Tr. 136-37). Specifically, Terry's daughter stated that Terry prepared her own meals and did all of the house and yard work, though she explained that it took Terry longer to perform these activities due to knee pain. (Tr. 138). In slight contrast to Terry's testimony, Terry's daughter asserted that Terry went out every day, drove, visited friends, and shopped. (Tr. 139-40). Finally, Terry's daughter noted that Terry had no problems getting along with others but did not handle stress well. (Tr. 141-43).

**B. Medical Evidence**

### *1. Treating Physicians*

#### a. Dr. Kenneth D. Shively

On January 29, 2004, Dr. Kenneth D. Shively began treating Terry upon initial complaints of fatigue and dyspnea on exertion. (Tr. 210). At the time of Terry's initial appointment, Terry weighed 293 pounds. (Tr. 210). Dr. Shively diagnosed Terry with morbid obesity, fatigue, history of anemia, and history of hypercholesterlemia. (Tr. 210). On July 29, 2004, Dr. Shively additionally diagnosed essential hypertension, morbid obesity, and bilateral

osteoarthritis of the knees bilaterally.  (Tr. 204).  On August 23, 2004, Dr. Shively diagnosed right LS spasms in Terry's back.  (Tr. 202).  On September 10, 2004, Dr. Shively additionally diagnosed hyperlipidemia.  (Tr. 197).

On January 17, 2005, Dr. Shively opined that it was imperative that Terry's hernia be repaired before it became incarcerated.  (Tr. 188).  As a result, Dr. Shively referred Terry for an exercise stress test, which was performed on January 20, 2005.  (Tr. 186, 188).  On June 14, 2005, Terry went to see Dr. Shively following three episodes of heart palpitations. (Tr. 181).  Dr. Shively instructed Terry to wear a heart monitor for two weeks.  (Tr. 181).  On July 5, 2005, the monitor revealed that Terry had experienced two more abnormal, palpitation episodes. (Tr. 173).  As a result, Terry was prescribed Atenolol. (Tr. 173).  On September 8, 2005, Terry called Dr. Shively's office, reporting a rapid heartbeat and panic attacks. (Tr. 172).  Terry stated that she "refuse[d] to take the medication" and requested alternative treatment.  (Tr. 172).  Dr. Shively's office responded that Terry needed to avoid caffeine and cigarettes, and needed to lose weight. (Tr. 172).

b.  Dr. John Rogers

On November 7, 2006, Terry began seeing Dr. John Rogers as her primary care physician. (Tr. 278).  Dr. Rogers diagnosed Terry with a ventral hernia, hypertension, morbid obesity, history of anemia, and history of hyperlipidemia.  (Tr. 278).  Over the next several years, Terry continued to receive ongoing treatment from Dr. Rogers; and, on several occasions, Dr. Rogers recommended that Terry adhere to a restricted diet. (Tr. 266-74).  Throughout her treatment with Dr. Rogers, Terry failed to show at appointments in December of 2006, May and September of 2007, and February, June, and July of 2008.  (Tr. 266, 268, 272, 277, 320, 323).

Further, on July 7, 2009, Dr. Rogers noted that Terry was not taking her blood pressure or thyroid medications as prescribed.  (Tr. 321).

On February 4, 2008, Dr. Rogers examined Terry for a Medicaid physical and diagnosed uncontrolled hypertension and hypothyroidism.  (Tr. 267).  Additionally, on August 25, 2008, Terry requested a written letter for disability.  (Tr. 329).  On September 12, 2008, Dr. Rogers complied, indicating in a letter that, although Terry was referred to a surgeon for evaluation and possible operative treatment of her ventral hernia, the surgeon determined that surgery would be very risky and possibly unsuccessful due to Terry's obesity.  (Tr. 328).  Instead, Dr. Rogers opined that Terry was "unable to stand or sit for prolonged periods of time because of the discomfort of the hernia and arthritic condition" and had "significant difficulty performing work or activities of daily living as a result."  (Tr. 328).

### 2. *Non-Treating Physicians*

#### a. Dr. David Mendelowitz

On April 18, 2005, Terry was examined by Dr. David Mendelowitz, a surgeon, for repair of her ventral hernia. (Tr. 170).  At the appointment, Terry indicated that her hernia was currently  "asymptomatic." (Tr. 170).  Dr. Mendelowitz noted that he could repair Terry's hernia but noted that the success of the surgery could be limited by Terry's weight. (Tr. 170).  Regardless, Dr. Mendelowitz indicated that he would repair the hernia, after Terry passed a cardiac evaluation. (Tr. 170).  Dr. Mendelowitz considered a prior stress test, ordered by Dr. Shively, to be inconclusive because Terry's heart had not been stressed sufficiently due to low exercise tolerance. (Tr. 170, 183).  As such, Dr. Mendelowitz referred Terry for a cardiac evaluation and  recommended that Terry see a dietician and participate in a weight loss program.

(Tr. 170).

Based upon the latter recommendation, on April 28, 2005, Terry participated in an intake with a nutrition therapy program at LaPorte Hospital. (Tr. 258). However, the dietitian assessed Terry as having only fair receptivity to the program and anticipated that Terry would only have fair compliance with the recommended dietary changes. (Tr. 258).

### b. Dr. John Halstead

On October 19, 2004, Terry was examined by Dr. John Halstead. (Tr. 193). Upon examination and a review of x-rays, Dr. Halstead diagnosed Terry with early degenerative arthritis of the left knee and recommended that Terry lose weight. (Tr. 193).

### c. Dr. David J. Gorecki

On July 25, 2008, Terry was admitted to LaPorte Hospital complaining of heart problems. (Tr. 313-15). While admitted, Terry underwent a series of cardiac tests and procedures. (Tr. 305-09). On July 30, 2008, Terry was discharged with diagnoses of: supraventricular tachycardia, hypertensive heart disease, essential hypertension, obesity, metabolic syndrome, and ventral hernia status post cholecystectomy. (Tr. 313). At discharge, Dr. David J. Gorecki noted that the "single best thing" Terry could do was to "exercise and lose weight." (Tr. 313). On August 13, 2008, Terry went to see Dr. Gorecki for a follow-up examination. (Tr. 317). At this examination, Dr. Gorecki noted that Terry was stable with no symptoms of angina pectoris or congestive heart failure. (Tr. 317). He recommended that Terry lose 100 pounds, recommended a number of diet and exercise plans to Terry, and noted that Terry qualified for bariatric surgery. (Tr. 317).

### 3. State Agency Physicians

a. Dr. Ralph E. Inabnit

On May 22, 2006, Terry underwent a consultative, physical examination with Dr. Ralph E. Inabnit. (Tr. 211-22). Terry reported a history of depression which was treated by her family physician and not a psychiatrist. (Tr. 220). Terry additionally indicated having difficulties with concentration and memory. (Tr. 220). Terry reported chronic low back pain and severe back spasms but denied participating in physical therapy, using back supports, performing back exercises, or seeking treatment at pain clinics. (Tr. 220). Further, Terry stated that she was not taking any medications and had not received any injections or surgical evaluations for osteoarthritis in her knees. (Tr. 220). Dr. Inabnit concluded that Terry suffered from: morbid obesity, chronic lower back pain, osteoarthritis of the knees, depression, poor motivation, poor concentration, chronic fatigue and memory impairment. (Tr. 222). In addition, Dr. Inabnit recommended that Terry undertake an "urgent dietary consult for weight loss," a psychiatric evaluation, and further diagnostic testing of her lower back and knees. (Tr. 222). At the time of the appointment, Terry weighed 311 pounds. (Tr. 214).

On May 30, 2006, internist Bruce Whitley completed a physical residual functional capacity form. (Tr. 223-30). Therein, Mr. Whitley opined that the record evidence suggested that Terry retained the ability to perform light work, with occasional limitations in postural activities and no climbing of ladders, ropes, or scaffolds. (Tr. 224-25). On September 6, 2006, Dr. J.V. Corcoran affirmed Mr. Whitley's opinions. (Tr. 254).

Nearly two years later, on March 24, 2008, Terry underwent a second consultative, physical examination with Dr. Inabnit. (Tr. 280-91). Terry reported that her back pain and knee pain had worsened; but Terry, again, denied having seen any orthopedists or neurologists,

participating in physical therapy, using back supports, seeking treatment at pain clinics, or undergoing any MRIs. X-rays, or CT scans. (Tr. 280, 289). Similarly, Terry reported worsening knee pain but told Dr. Inabnit that she had not received a orthopedic evaluation or injections. (Tr. 280). Additionally, although Terry did not discuss her depression, Dr. Inabnit noted the prior diagnosis in his evaluation. (Tr. 280, 289). Dr. Inabnit concluded that Terry suffered from morbid obesity, chronic lower back pain, chronic bilateral knee pain, depression, poor motivation, poor concentration, chronic fatigue, and memory impairment. (Tr. 291). Further, after examining x-rays of Terry's back and knees, Dr. Inabnit diagnosed mild arthritic spurring in Terry's right knee, moderate arthritis in her left knee, and minimal arthritis in her lower back. (Tr. 292, 294-95). Dr. Inabnit opined that Terry needed "an urgent weight loss program" to address her knee and back pain and a psychiatric evaluation. (Tr. 291). At this time of this appointment, Terry weighed 321 pounds. (Tr. 283).

b. Dr. John T. Heroldt

On June 22, 2006, Terry underwent a consultative, psychological examination with Dr. John T. Heroldt. (Tr. 231-35). Terry reported that she has suffered from depression off and on for seven years but indicated that she had never taken anti-depressant medication and that past trials with Xanax and Valium had failed to abate her symptoms. (Tr. 231). Dr. Heroldt observed that Terry walked with a normal gait, had an average work tempo, and had no problems filling out forms or following simple directions. (Tr. 231, 233). Dr. Heroldt diagnosed Terry with major depressive disorder, recurrent, moderate, and without interepisode recovery. (Tr. 233). Additionally, Dr. Heroldt noted that Terry had problems with her primary support group, was incapable of handling her funds, and had a below average cognitive capacity. (Tr. 233). Finally,

Dr. Heroldt assessed a Global Assessment of Functioning ("GAF") score of 54. (Tr. 233).

On June 23, 2006, Dr. Donna Unversaw completed a Psychiatric Review Technique Form ("PRTF"). (Tr. 236-48). Therein, Dr. Unversaw concluded that Terry had an affective disorder which caused moderate limitations in concentration, persistence and pace but only caused mild limitations in activities of daily living and maintaining social functioning. (Tr. 236-246). Additionally, Dr. Unversaw completed a mental residual functional capacity form, indicating that Terry was moderately limited in her ability to: understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 250-51). On September 7, 2006, Dr. Unversaw's findings were affirmed by a state agency physician. (Tr. 255).

On April 3, 2008, Dr. Heroldt performed a second consultative, psychological exam. (Tr. 296-300). Terry indicated that her depressive symptoms were episodic and stated that she tried to deal with her depression on her own. (Tr. 296). Dr. Heroldt observed that Terry had a slow gait, an average work tempo, and had no problems filling out forms or following simple instructions. (Tr. 296, 298). Dr. Heroldt diagnosed major depressive disorder, recurrent, moderate, and without interepisode recovery. (Tr. 298). In addition, Dr. Heroldt noted that Terry had occupational problems, was incapable of handling her funds, and had a below average cognitive capacity. (Tr. 298-99). Finally, Dr. Heroldt assessed a GAF score of 56. (Tr. 299). On April 9, 2008, a non-examining reviewer reaffirmed Dr. Unversaw's 2006 mental residual functional capacity form. (Tr. 252, 302).

**C. Testimony of the Vocational Expert**

Vocational Expert, Donna Whitcomb ("VE Whitcomb"), testified at Terry's hearing with the ALJ. (Tr. 354-60). The ALJ offered a hypothetical for an individual with Terry's age, education and employment history with an additional limitation to sedentary work with no climbing, no more than occasional balancing, stooping, kneeling, crouching, and crawling and a limitation to simple, routine tasks. (Tr. 356). In response to the ALJ's hypothetical, VE Whitcomb testified that the individual would be unable to perform Terry's past work, but could perform other work as a quotation clerk (196 jobs in the regional economy), a laminator (228 in the regional economy), and a final assembler (700 jobs in the regional economy). (Tr. 356).

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's finding of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute the Court's own judgment for that of the Commissioner.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.  *Id*.  Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions.  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act.  *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability.  20 C.F.R. § 404.1520(a)(4)(I)-(v).  The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and

5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. *See* 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Terry asserts four challenges to the ALJ's assessment of her case. First, Terry contends that the ALJ failed to give the appropriate amount of deference to the opinion of her treating physician. Second, Terry alleges that the ALJ inadequately articulated the reasons for discrediting Terry's testimony regarding the intensity, persistence, and limiting effects of her symptoms. Third, Terry contends that the ALJ failed to properly assess her residual functioning capacity. In particular, Terry argues that the ALJ: inadequately accounted for the limiting effects of her obesity; failed to consider her assigned GAF scores and her difficulty responding to criticism from supervisors; and insufficiently explained how the ALJ's additional limitation, that Terry be limited to performing simple, routine tasks, adequately accommodated her moderate limitations in concentration, persistence, and pace. Finally, Terry alleges that the ALJ made an

erroneous step five decision by failing to account for all of her limitations in his hypothetical to the Vocational Expert.

## A. The ALJ failed to adequately explain his reasons for not affording the opinion of Terry's treating physician controlling weight.

First, Terry alleges that the ALJ erred by giving too little weight to the opinion of her treating physician, Dr. Rogers. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is supported by the medical findings and consistent with substantial evidence in the record. *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). However, while the treating physician's opinion is important, it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842. An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Ultimately, an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has deemed this very deferential standard to be "lax." *Id.*

Nevertheless, once the ALJ articulates reasons for rejecting the treating physician's opinion, the ALJ still must determine what weight the physician's opinion is due under the applicable regulations. *Larson v. Astrue*, 615 F.3d 744, 751 (2010). *See* 20 C.F.R. § 404.1527(d)(2). Factors the ALJ should consider when determining the weight to give the treating physician's opinion include the length of treatment and frequency of examination, whether the physician supported his opinion with sufficient explanations, the extent to which the treating physician presents relevant evidence to support his opinion, whether the physician

specializes in the medical conditions at issue, and the consistency of the opinion. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Elder v. Astrue*, 529 F.3d 408, 415 (N.D. Ind. 2008); 20 C.F.R. 404.1527(d).

Terry alleges that the ALJ erred by giving too little weight to the opinion of her treating physician, Dr. Roberts. Specifically, Terry argues that the ALJ's stated reasons for rejecting Dr. Roberts' opinion were vaguely articulated. Reviewing both Dr. Robert's opinion and the ALJ's treatment of the same, Terry's argument is persuasive.

On September 12, 2008, Dr. Rogers, Terry's treating physician, opined that Terry "had significant difficulty performing work or activities of daily living as a result of [her diagnoses of morbid obesity, moderate to severe degenerative arthritis in her knees, a very large ventral abdominal hernia, and hypothyrodisim]." (Tr. 328). Dr. Rogers went on to specify that Terry was "unable to stand or sit for prolonged periods of time because of the discomfort of the hernia and arthritic condition." (Tr. 328).

In his decision, the ALJ discussed Terry's treatment by Dr. Roberts at length. *See* Tr. 32-34. However, in articulating his reasoning for discounting Dr. Roberts' opinion, the ALJ was rather brief. The entirety of the ALJ's explanation for giving the opinion less weight is stated as follows,

> Dr. Rogers failed to explain why sitting was precluded by the claimant's impairments, and his treatment records do not support his opinion that the claimant is disabled which, the Administrative Law Judge notes, is an opinion on an issue reserved to the Commissioner.

(Tr. 33). The ALJ went on to explain that he was not entirely disregarding Dr. Rogers' opinion, however, stating, instead, that,

> [T]he Administrative Law Judge has taken the concerns in Dr. Rogers' letter into

account by limiting the claimant to work at the sedentary exertional level rather than adopting the State agency's opinion that the claimant can perform work at the light exertional level.

(Tr. 33). Further, later on in his opinion, the ALJ added,

[T]he Administrative Law Judge reduced the claimant's exertional level from light to sedentary to more fully take into account her knee pain and her morbid obesity and to take into account the issues raised in Dr. Rogers' September 12, 2008, letter, although the opinion in his letter has not been given controlling weight for the reasons discussed above.

(Tr. 34).

To begin, the ALJ can not be said to have failed in his consideration of the Dr. Rogers' treatment records. Indeed, the ALJ's discussion of the same can be found in no less than six full paragraphs of the ALJ's opinion. Therein, the ALJ fully discussed the history of Dr. Rogers' treatment of Terry, including all relevant diagnoses, treatment recommendations, and opinions regarding Terry's ability to work. In addition, the ALJ noted Terry's repeated "no-shows" to her appointments with Dr. Rogers and Terry's failure to comply with all of Dr. Rogers' treatment recommendations. For instance, the ALJ stated,

The Administrative Law Judge notes that Dr. Rogers' records and the medical evidence of record indicated that the claimant appeared to be non-compliant with her medications at times; no showed for doctor's appointments; and also did not appear to comply with the recommendations from several physicians that she needed to lose weight.

(Tr. 34).

However, despite the ALJ's more-than adequate discussion of Dr. Rogers' treatment records, the ALJ's articulation of his reasons for discounting Dr. Rogers' opinion is lacking. Critical to a meaningful review by this Court is the ALJ's construction of "an accurate and logical bridge from the evidence to his conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.

2009); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (noting that an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Walker v. Bowen*, 834 F.2d 635, (7th Cir. 1987).

The ALJ may have had good reason for considering Dr. Rogers' treatment notes and postural limitations to be inconsistent with a finding of disability; and the ALJ was certainly correct in stating that such a conclusion is reserved to the ALJ and not to Terry's physicians. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (noting that a treating physician's opinion is important but is not the final word on a claimant's disability and can be discounted based upon internal inconsistencies or inconsistencies with other record evidence); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (noting the same); 20 C.F.R. § 404.1527(e)(1). Indeed, the ALJ may have considered Dr. Rogers to have misunderstood that, although Terry was limited to sedentary positions, such a limitation did not dictate a legal finding of disability under the Social Security Act. Such a conclusion could be reasonably contemplated, given both the ALJ's statement that a disability determination was limited to the Commissioner and the ALJ's added limitation to sedentary positions, attributable to Dr. Rogers' opinion. Further, the ALJ may have reasonably considered Terry's limitations to be exacerbated by her failure to follow Dr. Rogers' treatment recommendation to lose weight, given the ALJ's later discussion of Terry's inconsistencies in attending her appointments and in following a restricted diet. However, the ALJ did not make or explain any of these connections. This failure of articulation prevents this Court from meaningfully reviewing whether such reasons are adequately supported by the record

evidence and legally sufficient to justify the ALJ's discounting of Dr. Rogers' opinion.

Additionally, given the ALJ's minimal explanation, it is difficult to discern whether the ALJ properly represented the scope of Dr. Rogers' opinion. Specifically, the ALJ's opinion can be read as interpreting Dr. Rogers' opinion to preclude all sitting by Terry. *See* Tr. 33 ("Dr. Rogers failed to explain why sitting was precluded by the claimant's impairments."). However, Dr. Rogers' opinion does not limit Terry in this way, preventing Terry, instead, from sitting for "prolonged periods of time." *See* Tr. 328. While the ALJ's factual determinations are entitled to deference, the Court is bound to ensure that the ALJ's determinations find support in the record evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Potential mis-representations in the ALJ's characterizations of the record evidence suggest the possibility that the same was not fully and properly considered. *Compare Borland v. Astrue*, 2010 WL 5209380 **7-8 (E.D.Wis. 2010) (remand ordered in regards to an ALJ's incorporation of treating physician's opinion due to the ALJ's mis-characterization of the opinion).

As stated previously, however, the ALJ has provided a rather thorough discussion of Dr. Rogers' treatment notes. It seems unlikely that the ALJ did not properly consider the scope of Dr. Rogers' opinion. Rather, the confusion appears the result of insufficient articulation by the ALJ. For this reason, remand is appropriate in relation to the ALJ's treatment of Dr. Rogers' opinion.

**B. The ALJ failed to sufficiently explain his reasons for considering Terry's statements, concerning the intensity, persistence and limiting effects of her severe impairments, to be less than credible.**

Next, Terry challenges the ALJ's finding that Terry's statements concerning the intensity, persistence and limiting effects of her impairments were not fully credible.

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala,* 19 F.3d 329, 335 (7th Cir. 1995). Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006). However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003). Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Id.*; SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 416.929(a)-(b). In Terry's case, the ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause Terry's alleged symptoms. (Tr. 16). Second, after the first step is satisfied by the claimant, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." 20 C.F.R. § 416.929(a). While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000); SSR

96-7p. The regulations identify seven examples of the kinds of evidences the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 416.929(c); SSR 96-7p. The ALJ need not mechanically recite findings on each factor but must give specific reasons for the weight given to the individual's statements. *Ware v. Apfel*, 2000 WL 1707942 (S.D. Ind. 2000); SSR 96-7p.

Similar to Terry's previous challenge, Terry alleges that the ALJ's credibility determination was insufficiently articulated. Given the ALJ's perfunctory credibility determination, Terry's argument, in this regard, is also persuasive.

The ALJ's credibility determination consists entirely of one sentence of boiler-plate analysis. Specifically, the ALJ concluded as follows,

> After careful consideration of the evidence, the Administrative Law Judge finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are not fully supported by the medical and other evidence of record.

(Tr. 31). This language can be found in nearly every ALJ opinion, though it is almost always accompanied by further explanation of the *reasons* for such a finding. Some examples of such reasons include: inconsistencies in the claimant's testimony, inconsistencies between the

claimant's testimony and the medical evidence, inconsistencies between the claimant's testimony and the claimant's daily activities, and the claimant's failure to follow treatment as prescribed. *See e.g.* 20 C.F.R. 416.929(c)(4). Here, however, the ALJ offered no explanation *why* he considered Terry's testimony to be less than credible. Indeed, although the ALJ spent at least four paragraphs, preceding his credibility determination, discussing Terry's testimony in regards to her alleged limitations, treatment plans, and daily activities, *see* Tr. 30-31, the ALJ nowhere attempted to explain how such testimony was either internally inconsistent or inconsistent with other evidence in the record.[6]

The law in this regard is clear. An ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003); *Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003); SSR 96-7p ("The reasons for the credibility finding . . . must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that

---

[6]That said, it is noted that the ALJ's reasoning in regards to credibility might be found at a later point in the ALJ's opinion. *See* Tr. 34. Specifically, three pages later, the ALJ articulates the following observations without referencing a corresponding holding that it supports.

> The Administrative Law Judge notes that Dr. Rogers' records and the medical evidence of record indicated that the claimant appeared to be non-compliant with her medications at times; no showed for doctor's appointments; and also did not appear to comply with the recommendations from several physicians that she needed to lose weight. As noted above, Dr. Gorecki indicated that she would be a candidate for bariatric surgery.

Tr. 34. Many of these stated reasons are of the type that are typically articulated for discounting a claimant's credibility. *See* 20 C.F.R. 416.929(c); SSR 96-7p. However, the ALJ never drew a line between his credibility determination and these specific findings. As such, the Court cannot be certain that such a correlation exists. *See Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003); SSR 96-7p ("The reasons for the credibility finding . . . must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *Banks v. Barnhart*, 63 Fed. Appx. 929, 933 (7th Cir. 2003) (unpublished opinion) ("[N]othing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied.").

weight"). Instead, an ALJ is required to articulate specific reasons to support his credibility finding. *Id.* Because the ALJ failed to do so in the immediate case, remand on the issue of Terry's credibility is also appropriate.

**C. The ALJ erred when determining Terry's residual functioning capacity by failing to discuss Terry's difficulty responding to criticism from supervisors, and by failing to explain how the ALJ's RFC limitation, that Terry be limited to performing simple, routine tasks, adequately accommodated her moderate limitations in concentration, persistence, and pace.**

Terry additionally argues that the ALJ failed to properly assess her residual functioning capacity ("RFC"). In particular, Terry argues that the ALJ inadequately considered the limiting effects of her obesity, failed to consider her assigned GAF scores, failed to adequately discuss Terry's difficulty responding to criticism from supervisors, and insufficiently explained how the added limitation, that Terry be limited to performing simple, routine tasks, adequately accommodated her moderate limitations in concentration, persistence, and pace. In light of the ALJ's thorough discussion of the record evidence, Terry's first two arguments are unconvincing. However, Terry's third and fourth arguments are persuasive.

The ALJ must determine the claimant's residual functional capacity before performing steps four or five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. Residual functional capacity is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id.* This finding must be assessed based on all the relevant evidence in the record, 20 C.F.R. § 404.1545(a)(1), must consider all medically determinable impairments even if not considered "severe," 20 C.F.R. §

404.1545(a)(2), and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Haynes*, 416 F.3d at 626; *Golembiewski*, 322 F.3d at 917; *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

The ALJ found that Terry had the RFC requisite to perform sedentary work with the additional limitations that Terry was limited to simple, routine tasks and could only perform occupations which do not require climbing and which only require occasional balancing, stooping, crouching, kneeling or crawling. (Tr. 30).

### 1. Terry's obesity

Terry first asserts that the ALJ inadequately considered the limiting effects of her obesity in formulating his RFC opinion. An ALJ has a duty to consider the exacerbating effects of a claimant's obesity on her underlying conditions when considering his RFC determination. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Hernandez v. Astrue*, 277 Fed. Appx. 617, 623-24 (7th Cir. 2008)(unpublished opinion); SSR 02-1p.

To begin, despite Terry's contentions, a plain reading of the ALJ's voluminous RFC discussion reveals numerous occasions in which the ALJ considered and discussed the limiting effects of Terry's obesity. For instance, the ALJ frequently noted Terry's repeated diagnoses of morbid obesity and the history of Terry's fluctuating weight measurements, made at various points in Terry's treatment. *See* Tr. 30- 34. Similarly, the ALJ accounted for Terry's testimony and the competing doctors' opinions regarding the complicating effects of the Terry's obesity on her ability to obtain an adequate surgical repair on her ventral hernia. *See* Tr. 30- 34. Further, the ALJ noted the multiple medical opinions advising Terry to lose weight and adhere to a restricted diet, and Terry's lack of consistent compliance with the same. *See* Tr. 30- 34. Finally, after a thorough discussion of the evidence in this regard, the ALJ specifically stated that he "reduced the claimant's exertional level from light to sedentary to more fully take into account her knee pain and her morbid obesity." (Tr. 34). Given the ALJ's very thorough discussion of the medical evidence of Terry's obesity and the ALJ's clearly-articulated, additional RFC limitation, specifically made in regards to Terry's obesity, Terry's argument is entirely unpersuasive.

Further, reviewing Terry's argument more carefully, it is noteworthy that Terry failed to articulate how exactly her obesity exacerbated her underlying condition in a way that wasn't

discussed by the ALJ or otherwise incorporated into the ALJ's RFC determination. It is Terry's burden to specifically articulate how her obesity exacerbated her underlying conditions and further limited her functioning beyond those stated by an ALJ. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Hernandez v. Astrue*, 277 Fed. Appx. 617, 623-24 (7th Cir. 2008)(unpublished opinion). The closest Terry comes to making such an assertion is Terry's argument that the ALJ failed to consider the fact that her ventral hernia could not be repaired due to her obesity. *See* DE 23 at 2. However, Terry's argument still does not explain what additional limiting effects this fact has on her RFC and why the ALJ's specifically-tailored limitation to sedentary work does not adequately account for her morbid obesity. In the face of such anemic explanation by Terry, and the ALJ's thorough discussion of the medical evidence of obesity, the ALJ can not be said to have erred in his consideration of the limiting effects of Terry's obesity. *Prochaska*, 454 F.3d at 736-37; *Hernandez*, 277 Fed. Appx. at 623-24. Further, as stated previously, the ALJ noted Terry's testimony and the competing medical recommendations regarding the efficacy of such a surgery. Specifically, as part of his RFC discussion, the ALJ discussed: Terry's statement that she could not have surgery due to her weight, (Tr. 30); surgeon, Dr. Mendelowitz's 2005 recommendation that Terry could have hernia surgery, even despite her obesity, (Tr. 33); Dr. Rogers' 2008 opinion that Terry's obesity prevented surgery, (Tr.33); and Dr. Gorecki's 2008 opinion that Terry qualified for bariatric surgery. (Tr. 34). As such, the ALJ can not be said to have ignored this evidence in concluding that Terry is limited to sedentary work.

### 2. Terry's mental impairments

Next, Terry argues that the ALJ failed to adequately account for her mental impairments by failing to consider Dr. Heroldt's assigned GAF scores and the mental health findings of Dr. Unversaw, specifically in regards to Dr. Unversaw's statement that Terry had difficulty responding to criticism from supervisors. Terry contends that a proper review of the same would have rendered findings of more severe non-exertional limitations.

a. Terry's GAF Scores

Contrary to Terry's assertion, the ALJ noted and discussed both of the GAF scores[7] provided by state agency psychologist Dr. Heroldt.[8] *See* Tr. 28. The ALJ further noted that these scores, 54 and 56 respectively, both indicated moderate symptoms.[9] *See* Tr. 28. As such, Terry's argument that the ALJ did not consider this evidence is unpersuasive. Indeed, Terry points to no other GAF scores that the ALJ failed to consider. Instead, Terry blanketly argues that Dr. Heroldt's GAF scores suggest greater than moderate limitations. However, Terry provides no justification, based on the DSM-IV or some relevant legal precedent, to establish that the ALJ's interpretation of Dr. Heroldt's GAF scores, as evidencing moderate symptoms, was errant or unjustified. Further, Terry provides no other medical interpretation of her GAF scores in the record which explicitly supports a greater limitation. Consequently, it appears that Terry does not argue a failure of consideration by the ALJ, but, rather, argues a failure of

---

[7] A Global Assessment of Functioning ("GAF") provides a "reporting of overall functioning . . . [and is considered] particularly useful in tracking the clinical progress of individuals in global terms." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., text rev. 2000) [hereinafter DSM-IV-TR].

[8] In addition, also contrary to Terry's assertion, the ALJ acknowledged Dr. Inabnit's diagnosis of depression. *See* Tr. 32.

[9] A GAF score between 51 (low-end) and 60 (high-end) indicates the presence of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

outcome. However, where the ALJ has provided an adequate discussion of the evidence and the ALJ's conclusions are supported by the record evidence, the Court is not at liberty to overturn the factual findings of the ALJ. *See Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005) (noting that a reviewing court is deferential to the ALJ's factual findings, does not substitute its own opinion for that of the ALJ, and does not re-weigh the evidence); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing an ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it."). *See also Anderson v. Astrue*, 2010 WL 3522574 at *8 (N.D.Ind. 2010) (noting that an ALJ is not required to determine the extent of an individual's disability entirely upon GAF scores as such scores do not reflect a clinician's opinion of functional capacity).

### b. Terry's difficulty responding to criticism from supervisors

Also contrary to Terry's assertions, the ALJ's opinion evidences that the ALJ considered and discussed the non-exertional limitations opined by state agency medical consultant, Dr. Unversaw. *See* Tr. 28-29. Specifically, the ALJ stated, "[t]he Administrative Law Judge has given significant weight to the State agency medical opinion since it is generally consistent with the evidence of record." Tr. 29. Immediately thereafter, the ALJ went on to conclude, consistent with Dr. Unversaw's findings, that Terry had mild limitations in the areas of daily living and social functioning and had moderate limitations in the area of maintaining concentration, persistence and pace. *See* Tr. 29, 246. Further, at a later point in the ALJ's decision, the ALJ again stated his reliance upon Dr. Unversaw's opinions in determining the limiting effects of Terry's non-exertional limitations. *See* Tr. 34-35. Specifically, the ALJ stated,

> [T]he Administrative Law Judge has given significant weight to the opinion of the State agency psychologists and notes that their opinion is the only medical opinion

> on the claimant's ability to complete work related activities as a result of her mental impairment.

Tr. 34. Thereafter, the ALJ concluded that he was additionally limiting Terry to simple, routine tasks as a result of her moderate difficulties in maintaining concentration, persistence and pace, Tr. 35. As such, the ALJ spent considerable time discussing Dr. Unversaw's findings, adopted Dr. Unversaw's broad opinions regarding the severity of Terry's mental impairments, as indicated in the "rating of functional limitations" section of her Psychiatric Review Technique form, *see* Tr. 246.

Regardless of this fact, Terry persuasively takes issue with the ALJ's failure to discuss a specific finding in another one of Dr. Unversaw's reports. As stated previously, Dr. Unversaw opined, as part of her broad conclusions in the "rating of functional limitations" section of her Psychiatric Review Technique form, that Terry had mild, overall limitations in the area of maintaining social functioning. *See* Tr. 246. Further, as already discussed, the ALJ adopted these conclusions in whole part, as part of his RFC determination. *See* Tr. 29, 35, 246. However, in another more specifically-delineated mental RFC assessment form, completed by Dr. Unversaw on the same day as her rating of functional limitations form, Dr. Unversaw checked one of five boxes under the "social interaction" category as evidencing moderate limitations. *See* Tr. 251 (Dr. Unversaw identified no significant limitations in the other four boxes of this category). This box quantified Terry's ability to accept instructions and respond appropriately to criticism from supervisors as moderate. *Id*. Terry's argument is that this sole factor should have resulted in a finding of moderate rather than mild limitations in her social functioning.

With this understanding, although Terry presents her challenge as a failure of the ALJ to consider all of Dr. Unversaw's findings, Terry's argument appears to be better understood as an indirect challenge to the consistency between Dr. Unversaw's broad conclusions regarding Terry's mild limitation in social functioning and one of Dr. Unversaw's more narrow findings, which supported her broader finding. It is clear that Dr. Unversaw ultimately opined that Terry had mild limitations in social interactions; and, it is equally clear that the ALJ discussed and adopted Dr. Unversaw's broad finding *in toto*. However, neither Dr. Unversaw nor the ALJ explained how this broader finding of mild limitations in social interactions accounted for Terry's one area of moderate difficulty, accepting instructions and responding appropriately to criticism from supervisors. Because of this lack of explanation, Terry asserts that the ALJ wrongly concluded that she only had moderate limitations in her social functioning ability.

Generally, the ALJ need not discuss every piece of testimony and evidence in his opinion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Rather, the ALJ must only support his conclusions with substantial evidence in the record and build a logical bridge between the evidence and his conclusions. *Id.* Here, the ALJ adequately discussed the only medical opinions regarding the severity and limiting effects of Terry's depression and incorporated the broader finding of moderate limitations in concentration, persistence and pace into his RFC determination. *See Anderson*, 2010 WL 3522574 at *8 (noting that an ALJ is entitled to rely upon the expertise of state agency psychologists, given their expertise in the Social Security disability evaluation).

Nevertheless, a nearly-identical scenario was recently addressed by the Seventh Circuit, suggesting that remand in such situations is appropriate, though not required, to obtain greater

clarification by the ALJ.  *Compare O'Conner-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir.

2010).  Specifically, in *O'Conner-Spinner*, the Seventh Circuit considered an argument by the

Commissioner that an ALJ need not discuss findings made in a state agency physician's

"summary conclusions" section that were not also found in the broader "functional capacity

assessment" section of a state agency physician's record documentation.  *Id.*  However, declining

to indicate whether an ALJ may properly ignore what the Commissioner characterized as, "the

worksheets of a reviewing psychologist," the Seventh Circuit stated that remand was advisable

where the ALJ drew from both parts of the state agency physician's report in formulating his

RFC determination but failed to explain a finding that a claimant was moderately limited in the

ability to respond appropriately to criticism from supervisors.  *Id.*  In sum, the Seventh Circuit

declined to delineate what specific evidence in a state agency physician's documentation must be

explicitly discussed by the ALJ; and, instead, suggested remand in order to allow the ALJ an

opportunity to better articulate the weight given to a state agency's physicians' finding of

moderate limitation in the ability to appropriately respond to criticism from supervisors.

    The circumstances are nearly identical in this case.  In particular, the ALJ discussed

findings from both the "summary conclusions" section of Dr. Unversaw's mental RFC

assessment form and the "rating of functional limitations" section of Dr. Unversaw's Psychiatric

Review Technique form but failed to specifically discuss Dr. Unversaw's finding that Terry was

moderately limited in her ability to accept instructions and respond appropriately to criticism

from supervisors.  As such, consistent with the precautionary findings of *O'Conner-Spinner*, on

remand, the ALJ must also explain whether he credits this specific finding by Dr. Unversaw

finding and must explain how it factors into his RFC determination.

### 3. Terry's limitation to simple, routine tasks

Lastly, in regards to the ALJ's RFC determination, Terry contends that the ALJ insufficiently explained how the added RFC limitation, that Terry is limited to performing simple, routine tasks, adequately accommodates her moderate limitations in concentration, persistence, and pace. This argument is also persuasive.

As stated previously, after considering the opinions of the state agency physicians in regards to Terry's non-exertional mental impairments, the ALJ stated, "[t]herefore, the Administrative Law Judge has limited the claimant to simple, routine tasks which takes into account her moderate difficulties in maintaining concentration, persistence and pace." Tr. 35.

Terry first argues that the ALJ was not permitted to make the particular RFC limitation because the ALJ did not cite the opinion of any record medical opinion that specifically articulated the same. Contrary to Terry's assertion, however, the lack of an articulated RFC limitation by a record physician does not preclude the ALJ from formulating his own RFC limitations. Instead, the RFC determination is one firmly within the ALJ's discretion to determine, so long as his sufficiently articulates his reasoning and the record adequately supports his conclusion. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e)(2). *See also Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) (noting that a reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence but also noting that the ALJ must build a logical bridge from the evidence to his conclusion); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

After reviewing the record evidence, the ALJ's lack of citation to a record medical opinion which specifically opined a limitation to simple routine tasks, is the result of limited

record rather than an analytical fault of the ALJ.  Unlike the record in *Anderson*, no state agency physicians articulated specific, non-exertional RFC limitations on Terry's behalf, upon which the ALJ could have relied.  Instead, Dr. Unversaw made a finding regarding the severity of Terry's difficulties in maintaining concentration, persistence, and pace, which the ALJ adopted, but Dr. Unversaw did not also translate her conclusions into a corresponding RFC limitation.  As such, the ALJ could not have cited a medical opinion for the specific RFC limitation provided in this case, even if he wanted to do so.  As a result, the ALJ rightly relied upon other evidence in the record to formulate his particular RFC limitation. Once again, however, that discussion was not adequately explained.

When concluding, at an earlier point in his opinion, that Terry's limitations in concentration, persistence, and pace were moderate, the ALJ provided a minimal but adequate discussion for his conclusions.  First, the ALJ indicated his reliance upon the opinions of the state agency physicians, adopting each of Dr. Unversaw's broad conclusions regarding the severity of Terry's impairments.  *See* Tr. 28-29.  Additionally, in further support of his finding of moderate limitations in this particular area of functioning, the ALJ also discussed Terry's testimony and the opinions of Dr. Heroldt.  Specifically, the ALJ noted Terry's testimony that her depression caused lethargy and a lack of motivation.  *See* Tr. 29.  Further, contrasting Terry's testimony in this regard, the ALJ noted Dr. Heroldt's opinion that Terry had an "average work tempo."  Finally, the ALJ interpreted Dr. Unversaw's findings that Terry's slower task completion was due, in part, from her physical, rather, than mental limitations.  *See* Tr. 29. While not robust, this discussion, in relation to the severity of the limitation, is sufficient for this Court to trace the ALJ's reasoning and to identify the facts relied upon by the ALJ.

In stark contrast, however, the ALJ did not adequately discuss or factually support his subsequent translation of this severity finding into his specific RFC limitation to simple, routine tasks. Indeed, the ALJ cited only one fact in support of his finding that Terry still retained the ability to perform simple, routine tasks, despite her moderate limitations in concentration, persistence, and pace. *See* Tr. 34. Specifically, the ALJ noted that Terry was able to watch television and use a computer; and, from this single explanatory fact, the ALJ concluded that a limitation to simple, routine tasks would fully account for Terry's moderate difficulties in concentration, persistence, and pace. *See* Tr. 34-35.

While the limitation to simple, routine tasks may, indeed, accommodate Terry's non-exertional limitations, the ALJ's single, record citation is inadequate either to factually justify the limitation or to explain how the limitation proportionately accommodates Terry's identified limitation. While this Court is not to reweigh the factual conclusions of the ALJ, this Court can not uphold such conclusions if they are either inadequately discussed or insufficiently supported. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). As a consequence, remand is also appropriate for the ALJ to better explain why he considers a limitation to simple, routine tasks to adequately account for Terry's moderate limitations in this particular area of functioning, citing more than one piece of record evidence and articulating more than a couple sentences of explanation.

In sum, the ALJ did not error in his RFC determination on account of his consideration of Terry's obesity or GAF scores. However, remand, in relation to the ALJ's RFC finding, is appropriate for the ALJ to better explain his consideration of Terry's difficulties responding to criticism by supervisors and to better explain how the ALJ's RFC limitation to simple, routine

tasks accommodates Terry's moderate difficulties in concentration, persistence and pace.

Further, given the previously discussed deficiencies in the ALJ's articulated analysis and the

sequential nature of the disability determination, remand of the ALJ's RFC determination is

additionally necessary. Specifically, the ALJ must also reevaluate Terry's RFC after first

reconsidering the weight afforded to Dr. Roger's opinion and after reconsidering the credibility

of Terry's testimony.

**D.  The ALJ erred when making his step five determination by failing to clearly include Terry's moderate difficulties in maintaining concentration, persistence, and pace as part of his hypotheticals to the vocational expert.**

Finally, Terry alleges that the ALJ made an erroneous step five decision by relying upon

an outdated Dictionary of Occupational Titles ("DOT") to determine the number of jobs

available in the community and by failing to account for all of her limitations in the hypothetical

to the vocational expert ("VE").

At step five, if the claimant cannot perform her past relevant work, then the ALJ must

determine if she can perform other work in society. *See* 20 C.F.R. § 404.1520(g). If the

claimant can perform a significant number of jobs available in the economy then the claimant is

not disabled. *Id.* When a vocational expert provides testimony about the requirements of a

specific occupation, the ALJ has an affirmative duty to ask whether the testimony conflicts with

the DOT. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006); *Hofer v. Astrue*, 588

F.Supp.2d 952, 965-66 (W.D.Wis. 2008). Further, when there is an apparent conflict between the

vocational expert's testimony and the information provided in the DOT, the ALJ has an

affirmative responsibility to obtain a reasonable explanation for the apparent conflict. *Overman*

*v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008); *Hofer*, 588 F.Supp.2d at 966; SSR 00-4p.

However, where claimant's counsel did not identify a conflict at the hearing, the claimant must show that the conflict was obvious enough that the ALJ should have picked up on it without any assistance. *Overman*, 546 F.3d at 462-63; *Hofer*, 588 F.Supp.2d at 966-67.

Terry's first argument is without merit and can, therefore, be addressed in short order. The law is abundantly clear that, in making a step five determination, the ALJ is permitted to take administrative notice of the DOT and rely upon information contained therein. *Hofer*, 588 F.Supp.2d at 965-66; 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). As such, the ALJ did not err in relying on the same.

In light of this Court's prior conclusions, however, Terry's second argument is persuasive. Hypothetical questions posed to vocational experts must include all limitations supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). As previously discussed, the Court has identified several articulation deficiencies in the ALJ's analysis which will require the ALJ to reassess some pieces of the record evidence and, thereafter, reformulate his RFC determination. Consequently, because hypotheticals to the VE find their genesis in an ALJ's RFC determination and typically adhere closely to the same, the ALJ will also need to present new hypotheticals, consistent with the ALJ's reevaluated RFC determination, on remand. *See Packham v. Astrue*, 2011 WL 13531 at *10 (N.D.Ill. 2011)(holding valid a hypothetical based upon a valid RFC determination). *See also Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) (noting that an ALJ may properly rely upon a VE's testimony, so long as the ALJ submits a hypothetical that reflects the ALJ's conclusions regarding the extent of the claimant's impairments); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir.

2009) (noting that an ALJ is "required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible").

Because remand has been determined appropriate on this issue as well, the analysis could stop here. However, because a unique issue exists in this case that is likely to present itself again on remand, it is appropriate to provide some further discussion to guide the ALJ before concluding.

The Seventh Circuit has stopped short of requiring an ALJ, when soliciting testimony from a VE, to always articulate a claimant's limitations in concentration, persistence and pace in every case. *See O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619-21 (7th Cir. 2010). However, in most circumstances, articulation of this particular limitation is required. *Id.* (noting exceptions only when it is clear that the VE was apprised of the limitation, either through review of the record or through observation at the hearing, and when it is clear that the VE was permitted to take the limitation into consideration when responding to the ALJ's questions). Here, it is not clear that the VE was aware of Terry' moderate limitations in concentration, persistence and pace, either through a review of the record or through observation of testimony presented at the hearing. *See* Tr. 355-57. Further, while the ALJ solicited testimony from the VE and included a RFC limitation that the ALJ considered sufficient to accommodate Terry's deficiencies in concentration, persistence and pace, it is not clear that the VE was permitted to take Terry's actual deficiencies in concentration persistence and pace, into account when responding to the ALJ's narrow hypotheticals. *Id.*

In addition, otherwise potentially curative in this regard, it is not readily apparent from the ALJ's discussion of the evidence that the specific RFC limitation to simple routine tasks

obviously accommodated Terry's moderate limitations in concentration, persistence, and pace, based upon the source of Terry's impairments. In some circumstances, courts within this Circuit have excused an ALJ's poor articulation of similar RFC limitations, so long as it evident from the ALJ's discussion, that the source of the claimant's deficiencies in concentration, persistence, and pace, have obviously been accounted for by the specific RFC limitation. *See O'Conner-Spinner*, 627 F.3d at 619-21 (discussing examples of acceptable RFC limitations made in other cases). For instance, the *O'Conner-Spinner* court noted that a limitation to "repetitive, low-stress work" in *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir, 2002), obviously accounted for a claimant's limitations in concentration due to panic disorder. *Id*. The *O'Conner-Spinner* court, therefore, noted that the ALJ was excused from specifically articulating the claimant's concentration limitations in his hypotheticals to the VE. *Id*.

In this case, the ALJ made an effort, but did not succeed, in articulating his understanding of the etiology of Terry's moderate limitations in concentration, such that it is obvious that the ALJ's requisite RFC limitation obviously accounted for Terry's limitation in this area. *See* Tr. 29. In particular, this Court can not determine, from the ALJ's discussion, whether the ALJ ultimately considered Terry's limitations in concentration and pace to stem from her depression or from her physical impairments. For instance, when evaluating Terry's moderate limitations in concentration, persistence and pace, the ALJ discussed Terry's lethargy and lack of motivation as being the result of her depression. *See* Tr. 29. However, the ALJ also cited Dr. Unversaw's analysis that Terry's slower work pace was due to her physical limitations. *See* Tr. 29, 252. As a result, without knowing the ALJ's determined source of Terry's difficulties in this area of functioning, the Court can not begin to consider whether the ALJ's RFC limitation to simple,

38

routine tasks obviously accounted for Terry's limitations in concentration, persistence and pace, such that it would have been obvious to the VE.

Consequently, on remand, the ALJ is additionally cautioned to be mindful of this issue when submitting questions to the VE, being careful to solicit testimony that clearly incorporates the VE's consideration of Terry's credible limitations in concentration, persistence and pace. *See O'Conner-Spinner*, 627 F.3d at 619-21.

## V. Conclusion

For the foregoing reasons, Terry's motion to remand the ALJ's decision is **GRANTED**. [DE 1]. Accordingly, this case is **REMANDED** for further consideration by the ALJ, consistent with the conclusions in this order.

SO ORDERED.

ENTERED: March 7, 2011

<u>    /s/ JON E. DEGUILIO    </u>
Judge
United States District Court